This is our second case today. It's 4-13-0180. People of the State of Illinois v. Marvino Mister. For the appellant, we have Attorney Kelly Weston. For the athlete, we have Attorney Allison Brooks. Ms. Weston, are you ready to proceed? All right, you may begin. My name is Kelly Weston, and on behalf of the State Appellate Defender, I represent the appellant, Marvino Mister. In this case, the security guard testified has the identity of grainy, indecipherable figures depicted on black and white footage moving around a parking lot, even though he did not view those events as they occurred, nor had any familiarity with the individuals he claimed were on that footage. This was the only evidence presented at Marvino Mister's trial that placed him in the car with John Williamson, the man who later followed Sean Harrigan to Champaign-Urbana. Under these circumstances, we can have no faith in the jury's verdict as somebody's testimony wholly invaded their fact-finding duties. It was error in this case for the court to allow someone's testimony because it violated the silent witness theory and invaded the jury's fact-finding duties. And without this improper testimony, the State failed to prove Mister guilty beyond a reasonable doubt. With respect to the first issue, James Simmons, the supervising security guard, narrated hours of DVD footage from inside the casino and the parking lot. This was error because his testimony violated the silent witness theory of the visibility of that footage. Under the silent witness theory, photographic evidence may be used as substantive evidence even though there is no testimony of a witness with personal knowledge of the events. That evidence speaks for itself and cannot be admitted with further testimony, and can be admitted where there is no further testimony, where there is sufficient reliability of the way the evidence was produced. The witness is not allowed to narrate because they do not have personal knowledge of the events. Where they do provide their own interpretation, it invades the province of the jury. And that is exactly what Simmons did in this case. Simmons' testimony that it was specifically Marvino Mister getting into and out of that suspect's car crossed the line and interfered with the jury's fact-finding duties. This identification went to the ultimate issue, and Simmons was in no better position than the jury to decide the identity of the individuals. The error here is particularly appalling because of the extremely poor quality of the surveillance footage. Simmons stated he knew it was Mister because of the coat and the way he walked. However, even the most detailed viewing of this footage renders it impossible to make out any sort of distinguishing characteristics of anyone on that footage. Simmons himself even admitted it was a little tougher to see on the black and white footage, and at one point stated that other than the coat, there was no way he could tell the two individuals apart. These comments illustrate the problem with allowing Simmons' uncontradicted testimony concerning the identity of the individuals on the footage. The error here was compounded where the prosecutor repeatedly mentioned Simmons' testimony throughout the trial and in closing arguments. Of course there was no objection. The prosecutor also stated that Simmons watched the car the entire night, which was simply untrue. Simmons was not working at the time the event occurred and only pulled the footage later after they were made aware of the robbery. It should be noted that Simmons stated he thought the suspect car was a silver Pontiac Bonneville. However, no definitive information was ever obtained concerning the make and model of the car, nor was any license plate information ever obtained. Simmons stated that the nighttime conditions prevented him from getting a license plate reading. This was just another guess made by Simmons that interfered with the jury's fact-finding duties. Allowing Simmons' improper testimony was plain error because the evidence against Mr. was hardly overwhelming, as set forth in the second argument, and because his testimony invaded the province of the jury and rendered Mr.'s trial fundamentally unfair. We can have no confidence in the jury's decision where it was based on Simmons' improper testimony because without his narration there is no evidence that Mr. was in the car with Williamson or even in Champaign-Urbana. Simmons' improper narration was inadmissible evidence which bore on the ultimate issue and this court should either reverse Mr.'s conviction for insufficient evidence or reverse and remand for a new fair trial. State in this case also failed to prove Mr. guilty beyond a reasonable doubt because there was no evidence that Mr. was in the car with Williamson or in Champaign-Urbana and no positive eyewitness identification was made. The state's theory at trial was that Williamson arranged for Mr. to meet him at the casino where they would take turns watching Harrigan and later devise a plan to rob him. This theory presumes that Mr. was the black male who robbed Harrigan and relies entirely on the unproven assumption that it was Mr. in the car with Williamson. The only evidence that Mr. was near that car is the blurry unclear footage that was narrated by James Simmons and as previously discussed it was improper. But isn't there some video surveillance of him getting out of the car and coming back into the casino and with the timing you can tell that's the car he got out of? And then when he comes into the casino you have a clearer picture of him? Yes. But if you look at the time stamp on the video footage, isn't it very close in time? It's close. There's maybe a minute or two at times, but we also don't know whether there were already people in that area that it could be depicting, especially in the parking lot where it's not clear. And it still should have been up to the jury to decide the identity of that individual. Without Simmons' testimony, the state's case was weak and relied on guilt by association theory. Mr. happened to be at the casino several hours before the incident. He arrived shortly after midnight. What about with Simmons' testimony? With his testimony was... You acknowledge that there are courts that have said this kind of narrative is permissible? The only case that I'm aware of would be the Begay case and...well, or when there's a familiarity with the defendant. Do you gain a familiarity with the defendant by viewing clear video and seeing his driver's license and seeing him standing in front of him? The case law in Illinois at least... Well, I'm talking about more...this is an area that has developed. Yes. And there are jurisdictions and there are federal cases that suggest that, yeah, it's okay because it's helpful to the jury. There's a rational basis for determining that this individual has a greater opportunity to help... In this case, I don't think he was in any better of a position...Simmons was in any better of a position than the jury because they could have seen his...when they zoom in on the ID, they can watch that footage. He...just as he did. And the parking lot footage is just of such poor quality that even if you knew that person prior, you would not be able to tell that it was them in the parking lot. Well, as he explains the sequencing, though, and the timing, doesn't that add to the ability of a fact finder to make inferences from leaving the clearer video to transitioning to the less clear video? He can testify and perhaps say, these are the two individuals we're watching but not identify them and testify as to the layout of the casino and where the individuals seem to be walking. What about then when they seem to be walking out to the parking lot? He did testify that they were walking towards the parking lot but... And if an eyewitness saw something somewhat clearly and then the individual they're watching went behind a building for 15 seconds and then way over here, farther away, you see someone with the same attire, the same mannerisms in terms of walking or the shoulder slump or whatever, would the eyewitness be permitted to testify? I believe the individual that walked out from behind the building in the dark was the same individual that I saw going behind the building 15 seconds, 20 seconds, however long ago. Perhaps, but in this case, there are pause breaks of a minute or two between the individuals being inside and then the parking lot footage, and the parking lot footage is just so horrible. You can't tell what the person is really wearing or any particular mannerisms they may have. But what if 12 jurors don't agree with your assessment of what the video shows or how persuasive it is in terms of, or what value it has in terms of identification? That should have been left to the jury to decide. They had, here we can't be sure that they did not take Simmons' testimony into account because... Yeah, but you're now back to where, remember what I asked you first, with Simmons' testimony. And I understand that you've got a strong objection to that, and it's a meritorious objection. But if you lose on that, and the narration is proper, what then? Well, if you found that his narration was proper, then the jury, we can assume that they found his testimony reliable and that they thought Mr. was in the car. But there are also points in this footage where the car moves to the other side of the parking lot and there's no footage on the car during that hour or so that it was there, really. So we don't know if people were coming and going, and there was another point where the car went off camera for a couple of minutes. Once again, Mr., he arrived shortly after midnight at the casino, played craps for a while, and William Simms stood next to him for part of that time. He left at 2 and was never again seen, and the record is silent as to where he was after that. Williamson, however, stayed a lot longer and followed Harrigan clearly out of the casino after Harrigan collected his winnings. Isn't there a video around 4.03 of Mr. going back into the silver car and never getting out again? I thought there was video of that. That footage is after the car had been moved to the other side of the lot where we don't know what was happening in that hour. And then someone gets out of the car. There's closer footage of the individual. They walked past the pavilion area, so it's closer, but the footage is still poor quality. You can't make out any sort of distinguishing characteristics of the person. But then that person gets into the silver car and doesn't get out again. Correct. That we know of because the car does go out of view after it goes across the highway to the gas station area. Right, but while it's there in the parking lot, he doesn't get out. Yes, at least that we know of. And he's on the passenger side. Yes, Williamson gets into the driver's side. And there is clear video of Williamson at the end of the night, I believe even in color, exiting the casino and getting into that silver car. So it's not very clear why they couldn't have had the same quality footage for the other times in the parking lot that they were watching these individuals. There was no positive eyewitness identification made in this case either. Testimony of a single witness is sufficient to convict if positive and credible. The state's evidence in this case is lacking in this respect. Sean Harrigan indicated on the photo array and structure report that he did not recognize anyone from the photo array as the suspect. He had concerns about two of the photos and couldn't say for sure who was the suspect. Doesn't he use the phrasing 80 to 85% sure? He said 80 to 85% sure. And that was of the defendant? Yes. Not of somebody else that he might have thought? It was that it was Marvino, Mr. Does that mean anything? The jury certainly could have weighed that. That's not proof beyond a reasonable doubt. He had doubts, which is why he signed the instruction form that he couldn't recognize anyone as the suspect. His roommate also picked yet a different photo. And despite there being three eyewitnesses here, there was not a positive identification made. What about the fact that he said he had a rental car and they couldn't find a rental car rented to him? And the fact that he said his sister picked him up and took him to Peoria but he provided a name and they could never find anybody by that name? And his girlfriend showed up with a silver Bonneville? At a court hearing, yes. His girlfriend did have a silver Bonneville and they did execute a search warrant, didn't find anything in there. And once again, it was never proven that the suspect's car was a Bonneville. I thought they found a cell phone. Huh? I thought they found a cell phone. They did not find a cell phone. In the car? Correct. I thought it belonged to him, but it wasn't the cell phone he had on the occasion. He had a cell phone. They didn't find the victim's cell phone, which had been taken. Right. But, yes, it was the cell phone that, it wasn't the same cell phone that he had used. But it tied him to the Bonneville. Oh, well, and it was his girlfriend's car as well. Okay. There was never any proof that the suspect's car was a Pontiac Bonneville and they never got any, like, certainly. No, I'm just, agreed, but silver. Yes. And, I'm sorry. The other two points. Yeah, the other two things were the sister who didn't exist, at least they couldn't find her, and the rental car that he had, said he had, anyway. On the interview with the police, from my understanding, it was that the rental car was his sister's boyfriend's. I know one of the police officers said that he had, Mr. said he had a rental car, but then it was also that it was his sister's boyfriend's rental car, so it was just unclear from the record exactly who had the rental car, and he did say he got a ride home from his sister and her boyfriend. We don't have any specific information on whether. Well, was there evidence that the investigators or detectives presented to the jury that they had looked for a rental agreement, or looked for the sister who had supposedly taken him home, and did that get in front of the jury? They did say that they looked for his sister and couldn't find her at the address, or couldn't find any records, utility records or anything for her in Peoria. It's not, that was the most that they offered. It wasn't completely clear what name he gave or where he said she lived. And she never testified, this supposed sister? No. The state's case here was not sufficient to prove Marbino Mister was the man who robbed Kerrigan. Accordingly, this court should reverse this conviction. In this case, there was no evidence that Mister participated in the robbery, no evidence that he was in Champaign-Urbana, there were three eyewitnesses, yet no identification was made, and there was no evidence that Mister was in Williamson's car. What we did have, however, was Simmons's improper testimony and a broad pattern of interfering upon the jury's fact-finding duties, leading them to their ultimate burden. Was the photo of Rae presented to the victim and the other two individuals who were eyewitnesses, or just the two of them? It was never stated whether the third eyewitness, Alman Agrawal, it was never stated whether or not he viewed it. So there was nothing in the record about that. Similarly, did the police officers get a description from the testimony, or just two, because it appeared to me from looking at the facts that it was just two? That also was not there. I know that James Romelli, the other roommate that looked at the array, he lived with Kerrigan, and I know they stated that Mister Agrawal had left at some point, left the apartment, and it's possible he wasn't there when the police came and talked to them. Your Honor, if there are no further questions, Markino must respectfully request that either his conviction be reversed or that it be reversed and remanded for a new fair trial. Thank you. Thank you, Ms. Weston. Ms. Brooks? Thank you, Your Honor. May it please the Court, I'm Allison Page Brooks. I represent the people of this case. First of all, I'd like to address the standard review, which there is some dispute as to. With respect to the interpretation of Rule of Evidence 701, that is something this Court can do to go about, but with respect to the trial court's exercise of discretion pertaining to the facts of this case, the issues of whether the sentence testimony narrated in the video was helpful to a clear understanding of this testimony or a determination of the fact of the issue, or whether it invaded the province as a jury, that question should be reviewed by this Court for abuse of discretion not denoted. So, also because of the forfeiture, the defendant has shown a clear, obvious error, so there would be a clear, obvious abuse of discretion in application of Rule 701. And also, the defendant also has shown that the evidence was closely balanced. Those are things that the defendant cannot do, so therefore the forfeiture should be upheld and the judgment be sustained on that basis. You don't think the evidence was closely balanced in this case? No, Your Honors. And may I get to that later in the argument? Addressing the merits of the 701 issue first, please?  Okay, thank you, Your Honors. The Begay case disposes of the defendant's legal contention that there must be a, that the defendant, I'm sorry, that Simmons has to have a personal perception of contemporaries reviewing the incidents with his own two eyes. That that's somehow, what I take from the defendant's argument, that's not the case in Rule 701. Begay involves an issue where one officer was filming something and another officer was recording that and then testifying to provide the plea opinion under Federal Rule of Evidence 701, which is identical to Illinois Rule of Evidence 701. So therefore, Begay's analysis, with respect to the requirement of a perception of a witness, because the witness, Simmons, was not testifying as an eyewitness, but was providing a plea opinion drawn from his perception of the security video, that is permissible plea opinion under 701. So therefore, the legal issue to be reviewed de novo, this Court should find Begay in that analysis, dispose of that argument, and then proceed to determine the next issue for whose discretion. The Sykes case is distinguishable, very distinguishable, because in that case, the province jury was invaded and the opinion testimony was considered to be not helpful to the jury, because the jury can tell for itself a three-minute video which showed no one else. So here what we have is hours of video, multiple camera angles, many cars in the parking lot, many people inside the casino. So it's a situation where the witness, Simmons, cuts various segments of video from different cameras and then explains to the jury why he selected those particular segments, such as, here's the defendant, mister walking through the hallway, or something like that. So he's explaining, that is why I selected these particular segments of the video and put them together. And here, it is helpful to the jury, because the jury... ...of the fact and issue, or it helps the jury to efficiently do so. And so when Simmons, who's spending all this time putting together all these segments from many different cameras, is putting in that time and effort so the jury doesn't have to do that, and so the jury can understand why he chose those certain things. So that helps explain his testimony and helps the jury correctly and efficiently reach a determination on fact and issue, which is, one of the main facts and issue is, who was it that was getting in and out of that silver car? Now, the outside video is grainy. That's true. It's impossible to identify the defendant solely from looking from one particular camera angle. However, because the camera angles are aligned in such a way in the video that we're given a sequence in time, and there's not other people getting in and out of the cars and entering and leaving the casino at the same time. So it can be told that this person who leaves the silver car in that particular position in the parking lot, and then is shown moments later entering through the security checkpoint where the cameras are very clear, that can be ascertained that it was either defendant Mr. at certain times or the co-defendant accomplice, John Williamson, who had the distinctive Yale coat. And he was a lot more recognizable than Mr. But, however, this is not a situation where the argument is, well, there was no familiarity. Simmons didn't have the familiarity of the defendant from before. We didn't really need that, because this is kind of a unique situation. Because the defendant was under 30, the casino's policy was to require everyone in that situation to present a photo ID at the security checkpoint. So there's an image of the defendant standing or looking in his garb and his face recognizable, and a picture of the state-issued photo ID next to it. So it can be ascertained that that is, in fact, the defendant, Martin Lister, who was wearing that particular coat, who was seen walking in and out of the casino past the craps table, and who was also standing or gambling at the craps table for a length of time. So for that reason, Simmons did not need any pre-existing familiarity in order to identify the defendant. And even if it were a case where Simmons should not have identified the defendant, that's not going to lead to a false conviction here of an innocent person, because if the defendant had to give his photo ID, that was him. That much was not really contested, that it was, in fact, him with that photo ID entering and leaving the casino. So the fact that the claim would be then that, well, Simmons should have said it was just this person who left the car and went in and out of the casino, not said the defendant, that doesn't really mean much, because said it was obvious that that was, in fact, the defendant who was wearing that coat and making those movements. And also, with respect to whether Simmons had guessed at making the model of the car, the outside of the far view of the parking lot, it was more difficult to tell that that was a Pontiac behind the wheel. But that was not the only view that Simmons was able to use and look at in order to make that determination. So Simmons did not have to guess that that was a silver Pontiac behind the wheel. So also the defendant says it's untrue that Simmons watched the car all night. Well, the argument is, well, he didn't do it contemporaneously, but there is essentially enough cameras in that casino to constantly monitor the movements of both that car and the defendant in and out of the casino for the entire time. So the fact is, though, there are gaps in the footage, because what Simmons did is he took and provided the state and the police only with certain stretches of video from certain cameras. The state in the record does not have the entire footage from every camera for that entire time. You're suggesting that, because I think this is at odds with what counsel argued, that Simmons believed or thought he was able to identify the silver car that he continued to reference in his narration of the video as being a silver Pontiac Bonneville or just a silver car? I thought that Simmons even said it was a Pontiac Bonneville. So if he was able to make that opinion based on his view of all of the surveillance, not just the one exterior view, and that's the state's point essentially, is that Simmons was not limited to one grainy exterior view of the parking lot. There were multiple views of the parking lot, some that were clearer than others. The car did move, which of course is sort of an incriminating fact, because it didn't leave the parking lot. It came right back and parked in one spot adjacent to where it was initially parked. The timeline is very telling because the defendant's claim is that he left it too and is not seeing it again. Well, let's put aside the 4 a.m. dark figure part of it. He does leave the casino, gets back out of the car almost 10 minutes later, about 10 minutes later, around 2.05, re-enters the casino through the security checkpoint, then loops back past the craps table, comes back again past the craps table, leaves the security checkpoint, and gets right back in the silver car. The defendant can be identified as Marino Vistro inside the casino, and that person who's then getting out of the silver car and back into the silver car after that little trip past the craps table can be identified based on inference. The inference then also is that Williamson, 10 minutes later, does the exact same thing, and again at 3.08, loops again past the craps table, that's Williamson for a second time, doing the exact same thing that Marino Vistro did earlier. The inference there is that they're working in concert to surveil the victim, who is the inference to be made, they knew was winning a lot of money at the craps game, and were just simply waiting in that silver car in the parking lot for him to leave, because when the victim finally does leave the casino, Williamson is on his way in the casino, has to loop back around right away, make a quick U-turn, and get back in his car. Of course, Williamson's car, the silver car that Williamson and Vistro were in, was actually ahead of the victim's car for a little bit as they approached the stoplight outside the casino property. They both, though, head towards the straight pass of the highway into the gas station. The defendant's car then departs to the right a little bit, but then comes back into view as you see the victim's car leaving the gas station, heading down the highway, and then at that point, the defendant's car is behind the victim's car, heading down the highway, and that's the last surveillance video we have. So it's simply a speculation that somehow the defendant had gotten out of the car during those two minutes, that they're across the highway, outside of the view, that shows only the gas station, that somehow that is the point in time when the defendant got into a different car and left. But of course, the defendant's initial position is that he wasn't there until after 2 o'clock. Well, he told police he was there at 3, or until 3.30, or at latest 4 o'clock a.m. So if that's the case, then that's supposed to defend his argument that somehow he left the casino when he stopped gambling at 1.55, and as soon as he left, he left. Now, he admitted to police he was there as late as 4 a.m., so he was there for like another two hours, not gambling, outside the casino, waiting for some reason. And that's, again, an inference. And in combination with the fact he had at least once entered the casino to surveil the victim by looping past the craps table, identical conduct to his co-defendant, inference that what he's doing there is accountable. So the state's theory is if you loop past a crap table, you're surveilling that crap table. I mean, people walk around in casinos around crap tables, blackjack tables. The argument is that they had been gambling for, I think it was about an hour, with the victim at that same crap table. They both leave together. And then 10 minutes later, they come back in. Well, was that the only crap table they walked around? I have a hard time believing that. I would imagine they were walking around lots of crap tables. If you watch the video, you can track, his movement is tracked every moment when he's back inside the casino. And the only thing he does is... Was that the only crap table he walked around then? It looked like it, because that was the... If you follow his movements for the entire time he's back inside the casino... All right. Ms. Brooks, before you run out of time, Justice Pope had asked me the question early on, and you said you'd get to the point as to the state's theory why this isn't closely balanced. Yes. I'm going to answer the question. Okay. I'm trying to. Okay. I'm still waiting for the actual crime itself to occur and why that evidence isn't closely balanced. I hope you get to that. Right, I'm trying. Okay, thank you. Part of the idea of why it's incriminating to walk past, the only thing he does really when he gets inside that casino, is to make one loop past and one loop back past that same crap table. And that is really all he does inside the casino. It's all that Williamson does when he returns twice more. So because that is identical conduct and because the evidence against Williamson is so damaging, it shows that they're working in concert for a same criminal objective, which is to follow him once he leaves so that they can bother him afterwards. So he's accountable, even if somehow they had managed to enlist somebody from Havana, how they could have done that, I don't know, to show up and do the actual robbery. But what is also, it's not sufficient by itself, but it is strongly corroborating, is although the victim does not make a positive ID, he doesn't check the right box. He says, no, I can't make an ID, but he does say he was 80% to 85% sure that that was Margino Mister who had pointed the one with the gun. So that's strong evidence. How about his lack of identification in court? Well, the time had passed. It's a situation where the identification evidence is not exceptionally compelling evidence. How about one of the other eyewitnesses picking a different person from the photo array? That fact plus the fact that there were some distinctions or discrepancies in the physical description provided do tend to mitigate the strength of identification testimony. But again, the state doesn't rely on identification testimony as a primary evidence of his guilt. It's mostly a circumstantial case with strong corroboration from what the victim was able to say about in terms of the photo lineup and his strength of certainty. So I said that is strongly corroborating of all the circumstantial evidence. The connection with the silver Pontiac Bonneville and the defense statement, as I said, about him staying until 4, I guess what I was going to say is another evidence of why he was still there is that dark figure who gets out of the car around 4 a.m., approaches the pavilion, which is a lot closer and a lot less grainy. Now, it's not certain that that was the defendant, but because that's him, that's the same person getting out of that silver car and getting back into the silver car, it could be a strong evidence that that is, in fact, where Mr. Who was the one who approached the pavilion and then turned right around and got back in the same silver car. So that's strong evidence that he was still there, connected to that silver car that Williamson leaves in, and that's that much assured that that's Williamson driving, getting back out, following the victim, getting in that silver car and driving away. So the strong inference is that that's still where Mr. At least is at 4 o'clock in that car, never getting out. So he's still got to be in that silver car when Williamson drives away shortly after 427. So then it's left to speculation as to whether there had been some opportunity for him to get out of the car and not head to Champaign, but considering that was his girlfriend's car, it doesn't seem likely that he would abandon that car in the hands of Williamson. And even if he did, with the intent to promote or facilitate, then he's accountable for the robbery as well. With respect to the strength of the evidence, if this court is considering to reverse outright under the defendant's argument, this court should also consider Simmons' testimony, even if it were improperly admitted, if this court believes it were improperly admitted. When this court considers whether to reverse and remand for a new trial, even evidence that's improperly admitted can be considered by this court in determining the strength of evidence in terms of whether a double jeopardy bar is required. So the state certainly hopes this court agrees with the state's argument that the lay opinion was properly admitted, but even if it's improperly admitted, Simmons' statements can be considered for their weight in terms of the sufficiency of evidence and whether a retrial is permitted. So that makes the case stronger. But of course, Justice Pope, your question is whether the case was strongly weighted or closely balanced. Obviously, Simmons' testimony, if improperly admitted, cannot be considered as part of that calculus. But at least the very small, the low weight necessary for this court to affirm on sufficiency of evidence grounds or determine that double jeopardy does not bar a retrial, if Simmons' testimony is added to that weight, then the defendant is not entitled at all to an outright reversal. But the state's position is that the quality of the inside, cameras, views, the fact he showed his photo ID... Ms. Brooks, you've done a really good argument about that the defendant was at the casino and perhaps was casing out the craft table, but how about what happened to Champagne? I said you. Right. The identification testimony, even though it was not positive, that's corroborating that that was in fact more of even who had made the trip to Champagne. That's strongly corroborating that part of it. But there is no surveillance of what happened to Champagne, I understand that. Was there any evidence about this LaValle Allen or this other party who Williamson's phone was calling? Was ever presented to the jury? They tried to make something out of it to get the jury to suspect that he may have been enlisting someone else. It seemed like those phone calls were right around the time of the robbery. They were close in time to when the robbery was reported to 9-1-1, which is pretty much right after the robbery happened. But that doesn't necessarily mean that he was involved in the robbery itself. So did any evidence come out about that at the trial? I don't believe so. Did the investigation show any connection with this? Did they try to find him and interview him? I don't know the answer to that, I'm sorry. Before I let time stop, I would like to address the other defendant in the race that I think is important because it's possible to avoid judgment. With respect to the apprentice error, the jury instructions said, stated, even though the charge and the conviction are for armed robbery with a firearm. The defendant benefited from this because he did not receive a firearm enhancement. He was sentenced to straight 30, no enhancement for the firearm. The Daniels says that this is not plain error and that Watts says that this is not avoid judgment. So the defendant is not entitled to outright reversal or a new trial as a result of an instructional error. It's also the case that the defendant told the jury that he was not disputing that an armed robbery took place. This is not like Hogan-Sola. The other thing is that the defense also could have wanted this instruction, so it's not in effect of assistance of counsel. May I finish my argument? Yes. Sorry, thank you, Your Honor. Because he argued post-trial that there was no proof of dangerousness and firearms are not per se dangerous if this were a case where it was armed robbery with a dangerous weapon. So for those reasons, I'd like to thank the court and request the court to defer. Thanks. Thank you, counsel. Ms. Weston, rebuttal. Thank you, Your Honors. Can I ask you to address that last argument that Ms. Brooks was addressing? It seemed to me you guys didn't argue a prendy in your brief. The state raised it in their brief. Was there actually a 15-year add-on in this case? It didn't seem to me like there was. It was unclear. The prosecutor stated that there was no 15-year enhancement, but then they never really said anything more about it. Like when the trial court issued the sentence, they didn't. Usually what you see is like a 25-year, and then you see the 15-year enhancement separated, and that's not the case here. You just got a straight 30. Yes. It still was within the range that would have been available as well. And in terms of that argument, it is our position that under People v. Barnett, since the trial of the jury instructions did not include firearms but rather dangerous weapons, which is not what he was charged with, under People v. Barnett, his conviction should be reversed. And with respect to the question on the Pontiac Bonneville, Simmons did say that he thought it was a Pontiac Bonneville. It's our position that the video is too blurry or unclear to know that for sure, and there was also no license plate information obtained on the suspect vehicle. Sorry. Also, the footage, the state was mentioning that Marvino Mister said he was at the casino between 3 and 4. Really, he just wasn't sure. It had been a passage of about a week's time from when he provided his statement to the police officers, so really he just wasn't sure. He did give varying answers on that. But the footage does not show him back inside after he left shortly after 2 a.m. Is his interrogation recorded? It was, from what I can tell from the record, I don't know if there was an interrogation. He was transported from Peoria to Champaign, and they had a recording going at that time until he said he wanted to stop talking. In terms of the Begay case, it is completely different from Mister's case. There, the testifying officer had enhanced footage and did have familiarity with the people he was identifying, and that case involved basically a riot with 200 people, and they were doing all sorts of different things. His testimony was bound to aid the jury because of the inefficient use of their time if they would have been required to look at that and determine what all was happening. Here, Simmons could have reviewed this parking lot footage as long as he wanted. It was of such unclear quality that he would never have been able to tell what was going on. There was a broad pattern in this case of impeding upon the jury's backfinding duties, which led them to their verdict and rendered Mister's trial fundamentally unfair. Your Honors, if there are no further questions, Martino, Mister respectfully requests that this Court reverse its conviction for reversing their ban for a new trial. Thank you. Thank you, Counsel. This Court will take this matter under advisement and be in recess.